**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

**No. 16-4844**

————————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JUAN ALBERTO ORTIZ-ORELLANA, a/k/a Chele, a/k/a Furia,

Defendant - Appellant.

————————————

**No. 16-4845**

————————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MINOR PEREZ-CHACH, a/k/a Minor Chach-Perez, a/k/a Little Bad, a/k/a Bryant
Sacarias,

Defendant - Appellant.

————————————

Appeals from the United States District Court for the District of Maryland, at Greenbelt.
Roger W. Titus, Senior District Judge.  (8:13-cr-00496-RWT-2; 8:13-cr-00496-RWT-8)

————————————

Argued:  September 19, 2023                     Decided:  January 10, 2024

————————————

Before KING, Circuit Judge, and MOTZ and FLOYD, Senior Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Senior Judge Floyd wrote the opinion in which Judge King and Senior Judge Motz joined.

---

**ARGUED:** Manuel J. Retureta, RETURETA & WASSEM, PLLC, Washington, D.C.; Carmen D. Hernandez, LAW OFFICES OF CARMEN D. HERNANDEZ, Highland, Maryland, for Appellants. Sangita K. Rao, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kenneth A. Polite, Jr., Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Thomas E. Booth, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Erek L. Barron, United States Attorney, Baltimore, Maryland, William D. Moomau, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

---

2

FLOYD, Senior Circuit Judge:

Defendants Ortiz-Orellana ("Ortiz"), Minor Perez-Chach ("Perez") (collectively, "Appellants"), and others, were convicted in 2016 by a jury of conspiracy under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d) (Count 1), and murder in aid of racketeering in violation of the Violent Crimes in Aid of Racketeering statute, 18 U.S.C. § 1959(a)(1) (VICAR) (Count 6 and 8).  Perez was also convicted of being a felon in possession of a firearm and ammunition, 18 U.S.C. § 922(g)(1) (Count 11); and being an alien in possession of a firearm and ammunition, 18 U.S.C. § 922(g)(5) (Count 12).  Ortiz was also convicted of VICAR conspiracy to commit murder, in violation of 18 U.S.C. § 1959(a)(5) (Count 7); discharging a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count 9); and murder resulting from the Section 924(c)(1) offense, in violation of 18 U.S.C. § 924(j) (Count 10).

Perez was sentenced to life imprisonment on Counts 1 and 6, and to 63 months' imprisonment on Counts 11 and 12, all to run concurrently.  Ortiz was sentenced to concurrent terms of life imprisonment on Counts 1 and 8; a concurrent term of seven years on Count 7; and a ten-year term on Count 9 and life term on Count 10, concurrent to each other but consecutive to the other terms.  Appellants Ortiz and Perez now ask that their convictions be reversed, and their sentences vacated and remanded.

For the reasons that follow, we vacate and remand Ortiz's sentence only as to Counts 9 and 10.  We otherwise affirm Ortiz's and Perez's conviction and sentences.

3

I.

This case involves two consolidated appeals by Ortiz and Perez. Ortiz and Perez were charged with crimes related to their participation in a gang known as MS-13 and were charged with separate murders related to their involvement in MS-13 in Maryland.

A. Perez's Crimes – the "Shorty" murder

Jorge Moreno-Aguilar ("Moreno"), who was a co-defendant with Ortiz and Perez, Oscar Parada-Ramirez ("Parada"), and Melvin Marquez-Sanchez ("Marquez") were members of the Sailors clique, an MS-13 group in Maryland. A Sailors clique member, "Shorty," was a government informant and testified against MS-13 members in the 2000s. The head of Sailors, Juan Otero ("Otero"), "green-lighted" "Shorty," which authorized any MS-13 member to kill him on sight. S.A.[1] 127-28. On February 23, 2013, Perez called Parada, who said he saw "Shorty" at a nightclub and followed him. Parada joined and saw Perez repeatedly stab Nicholas Gonzalez ("Gonzalez" or "Shorty"), whose nickname was also "Shorty." He was not the informant known as "Shorty." Perez murdered the wrong "Shorty." Parada also slashed Gonzalez with a machete, and Gonzalez died from the attack.[2] In March 2013, Perez and two accomplices tried to rob a motorist. When the motorist refused their demands, one assailant hit him. J.A. 162–64.

---

[1] J.A. and S.A. refer to the Joint Appendix and Supplemental Appendix, respectively.

[2] Later in 2013, Perez shared a jail cell with MS-13 member Pacheco-Guzman ("Pacheco"). Perez told Pacheco he had murdered "Shorty" because he was "green-lighted." S.A. 116-17.

4

B. Ortiz's Crime – the Mendez Murder

In 2013, Moreno, a co-defendant, told Otero, Parada, and Marquez that Erick Mendez-Orellana ("Mendez"), a rival gang member, lived near him. They decided to kill Mendez in an attempt to be admitted into the Sailors clique. On March 12, 2013, Ortiz and Moreno saw Mendez, his partner Maurisha Jackson, and two children come out of a laundromat near their home. Jackson took the children home, leaving Mendez alone. Once Mendez left the laundromat to travel home, Ortiz shot him three times in the head, killing him (Counts 8-10).

C. Investigation

On March 20, 2013, during an investigation of the Mendez murder, a state detective applied for a court order pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. § 2703(d), to obtain Ortiz's phone number from AT&T.[3] Among the requested records was historical cell site location information ("CSLI") for the previous 30 days and for the next 60 days. J.A. 812–18. A state judge issued the order. The state judge found "probable cause to believe that the information" concerning Ortiz's phone number was "relevant and material" to the government's criminal investigation. J.A. 819.

---

[3] The standard to obtain a court order under the SCA is "reasonable suspicion." *In re Application of U.S. for an Ord. Pursuant to 18 U.S.C. Section 2703(d)*, 707 F.3d 283, 287 (4th Cir. 2013) ("This is essentially a reasonable suspicion standard.").

5

On June 17, 2013, a federal prosecutor applied for an order pursuant to § 2703 to compel AT&T to provide CSLI for Perez's phone number for a 60-day period (Feb. 2 to March 31), including the February 23, 2013, "Shorty" murder.  A federal magistrate judge granted the application, finding that the government had offered "specific and articulable facts showing that there are reasonable grounds to believe that the records and other information sought are relevant and material to an ongoing criminal investigation." J.A. 853–54.

### D. Court Proceedings

Multiple defendants, including Ortiz and Perez, were indicted in district court in Maryland.  Many disputes in this case centered around cell tracking data the prosecution used to prove the crimes.  During a pretrial hearing, Ortiz requested suppression of data obtained by "GPS/GEO tracking" to locate him and argued the SCA order did not authorize that technique to track him.  During a motions hearing, the trial judge stated that defendants can assume that when any individual defense attorney makes an objection, "all [will] be deemed to have joined in it."  On that same day, the judge stated, "in terms of motions to adopt, I will grant those."  "I will deem that you've joined in other motions to the extent that you have standing to do so." J.A. 93.  The judge denied the motion to suppress.

At trial, the government presented AT&T cell phone records of Ortiz, Perez, and various other individuals. J.A. 318–458.  The government offered three charts (SC1, SC2, and SC3) that listed cell phone calls to and from various phone numbers, including those of Ortiz, Moreno, and Perez, based on evidence previously admitted.  The government

6

intended to use the charts to map out the locations of the defendants during each murder. Appellants objected to the admission of the charts, and the court directed the government to remove defendants' names from the charts but allowed the summaries to show location data.  J.A. 473–74.  The court ruled that the government could use names associated with the phones during closing argument based on independent evidence establishing those facts.  J.A. 474.

Later, the court ruled that under Fed. R. Evid. 1006 the charts would not be admitted into evidence, but the government could use the charts to summarize previously admitted cellular record evidence.  Before FBI Special Agent Joseph Simms ("Agent Simms") testified using the charts regarding subscriber information and location data from cellular records, the court instructed the jury that the charts were not admitted into evidence but were merely an "illustrative aid" to assist the jury in understanding the evidence.  J.A. 577–78, J.A. 584.

The court further provided jury instructions that the charts were "no better than the independently admitted evidence" and that the jury should not give them greater consideration than the admitted evidence because the charts did not constitute "independent evidence."  J.A. 644.  Finally, it instructed the jury to consider the charts only "if they were of assistance to you in analyzing the evidence and understanding the evidence."  J.A. 644.

Following a 14-day trial, the jury convicted Ortiz and Perez of conspiracy under RICO and murder in aid of racketeering in violation of VICAR.  Perez was also convicted of being a felon in possession of a firearm and ammunition.  Ortiz was convicted of VICAR conspiracy to commit murder, discharging a firearm in furtherance of a crime of violence,

7

and murder resulting from a crime of violence (Counts 9 & 10). Perez was sentenced to life imprisonment on Counts 1 and 6, and 63 months' on Counts 11 and 12, all to run concurrently. Ortiz was sentenced to concurrent terms of life imprisonment on Counts 1 and 8; a concurrent term of seven years on Count 7; and a ten-year term on Count 9 and life term on Count 10, concurrent to each other but consecutive to the other terms. The trial court stated it imposed the consecutive sentence on Count 10 because it was required to do so under Fourth Circuit caselaw. S.A. 232–36. Ortiz and Perez timely appealed.

## II.

Appellants Ortiz and Perez now ask us to vacate their sentences and remand for sentencing. First, Appellants submit that the government seizure of CSLI without a warrant violated their Fourth Amendment rights. Second, Ortiz and Perez assert the district court erred in allowing the use of summary exhibits and failed to provide a limiting instruction regarding summary testimony. Third, Ortiz argues his firearm convictions, Counts 9 and 10, must be vacated because the underlying offenses for each VICAR count, Maryland first-degree or second-degree murder, are indivisible offenses that encompass felony murder, and therefore cannot qualify as a "crime of violence" after *United States v. Jackson*, 32 F.4th 278, 285 (4th Cir. 2022). Fourth, Ortiz argues his RICO and VICAR convictions violate the Double Jeopardy Clause. Fifth, Ortiz and Perez argue their sentences were substantially unreasonable. We address each issue in turn.

8

A.

We begin with the issue of whether the district court erred in denying the motion to suppress historical CSLI. First, however, we address the disagreement over whether Perez preserved this issue.

Because Ortiz alone filed the motion to suppress the CSLI on Ortiz's phone, the government argues Perez did not preserve this issue. However, likely because of the number of defendants and motions, the trial judge stated, "I will deem that you've joined in other motions to the extent that you have standing to do so." J.A. 93.

A defendant must generally raise a motion to suppress before trial. See Fed. R. Crim. P. 12(b)(3)(C). In some circumstances, however, we have allowed an appellant to raise an issue if a co-defendant filed a pre-trial motion on that issue. *United States v. Stewart*, 256 F.3d 231, 238 (4th Cir. 2001) (a co-defendant's venue issue was properly preserved for appellant on appeal because ambiguity should be waived in favor of appellant). Further, Perez did object at trial on the basis of a then-pending case, *United States v. Graham*, 796 F.3d 332 (4th Cir. 2015), which evaluated whether the procurement of historical CSLI was an unreasonable search. J.A. 464-65. Although the judge's comment about co-defendants' joining in other motions was not entirely clear, we think Perez properly preserved the issue on account of Ortiz's motion to suppress. *See, e.g.*, *United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) ("[T]he objection of a co-defendant is an objection for all defendants, and it is sufficient to preserve the issue for appeal.").

9

This Court reviews the denial of a motion to suppress *de novo* and factual findings for clear error. *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021). Appellants Ortiz and Perez argue that pursuant to *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the SCA applications were not supported by probable cause, the admission of evidence violated the Fourth Amendment, and the CSLI must therefore be excluded. However, an exception to the exclusionary rule exists where government agents acted with an objectively reasonable "good faith" belief that their conduct was lawful. *Davis v. United States*, 564 U.S. 229, 238 (2011). Here, the SCA requests for the CSLI on Perez's and Ortiz's phones were made in 2013. We have held that collection of historical CSLI through warrantless court orders before *Carpenter*'s decision in 2018 is subject to the good faith exception. *United States v. Taylor*, 54 F.4th 795, 804 (4th Cir. 2022); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018). The good faith exception to the exclusionary rule applies to the 2013 SCA orders in this case. The historical CSLI collected through the SCA was subject to the good faith exception and therefore we reject Appellants' suppression challenge.

B.

We next turn to Perez's and Ortiz's contentions that the district erred when it allowed the use of summary exhibits prepared by Agent Simms and failed to provide the jury with a limiting instruction regarding Agent Simms's summary testimony.

We first address the use of the summary exhibits. Agent Simms prepared charts to summarize calls related to Ortiz's and Perez's crimes. After defendants objected to the

10

summary exhibits, the trial judge had the government remove Ortiz's and Perez's names from the charts to help mitigate their concerns. The trial court did not admit the summary charts into evidence and provided multiple limiting instructions to the jury regarding the use of the charts.

This Court reviews a district court's evidentiary rulings for abuse of discretion. *United States v. Spirito*, 36 F.4th 191, 211 (4th Cir. 2022).

The Federal Rules of Evidence provide two ways for a party to use summary charts at trial. Based on the record, it is unclear under what rule the judge allowed the presentation of evidence. Rule 1006 permits summary charts to be admitted into evidence "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). And Rule 611 permits the admission of summary charts "to facilitate the presentation and comprehension of evidence already in the record." *Id*. at 273; *see also United States v. Johnson*, 54 F.3d 1150, 1159 (4th Cir. 1995). The trial court referred to Rule 1006 when it considered the parties' arguments but did not admit the charts into evidence. However, the judge stated that the charts were "intended to summarize, clarify, or simplify testimonial evidence or other evidence that has been admitted." J.A. 568.

In *Simmons*, we held that while summary charts are admissible to facilitate the comprehension of evidence in the record (Rule 611), a court should provide a limiting instruction to "ensure that the jury does not 'rely on that chart as independent evidence,' but instead focuses its deliberations on 'the evidence upon which that chart is based.'" *United States v. Simmons*, 11 F.4th 239, 262 (4th Cir. 2021) (quoting *Johnson*, 54 F.3d at

11

1159) (cleaned up). But we stated that summary charts admitted as a surrogate for admissible voluminous records (Rule 1006) do not require a limiting instruction. *Id.* at 262 n.13.

The trial court instructed the jury before Agent Simms showed the summary chart that it should be viewed as an "illustrative aid," J.A. 577-78, J.A. 584, and provided jury instructions at the close of evidence, which told the jury they should not give "greater consideration to these schedules or summaries than you would give to the evidence on which they are based" because the charts were not "independent evidence." J.A. 644. We presume juries follow the court's instructions. *United States v. Council*, 77 F.4th 240, 262 (4th Cir. 2023). Because the district court's limiting instructions were adequate to prevent the jury from giving the summary charts undue weight, the district court did not abuse its discretion.

The district court also did not err in providing a limiting instruction for Agent Simms's testimony at trial. Because Ortiz and Perez did not request a limiting instruction for Agent Simms's testimony at trial, this claim is reviewed for plain error. *Greer v. United States*, 141 S. Ct. 2090 (2021). On plain error review, appellants must establish "(1) that the court erred, (2) that the error is clear and obvious, . . . (3) that the error affected [their] substantial rights," and that the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Ali*, 991 F.3d 561, 572 (4th Cir. 2021); *see also Greer*, 141 S. Ct. at 2097 (observing that "[s]atisfying all four prongs of the plain-error test is difficult" (internal quotation marks omitted)).

12

Ortiz and Perez also argue that the district court erred by permitting Agent Simms testify to substantive matters not contained in the charts, like mentioning that phone numbers listed in the charts belonged to "people of interest in this homicide," thereby implicating Ortiz and Perez as linked to those phone numbers. J.A. 579–82; J.A. 586–89. Further, they argue the district court erred by not limiting Agent Simms's testimony when he offered inferences that could be drawn from cell phone records, and testifying that he eliminated communications of less than four seconds because they could indicate missed calls.

In support, Appellants rely on a case in which the D.C. Circuit held that an agent's testimony in summarizing records went "too far." *United States v. Abou-Khatwa*, 40 F.4th 666, 687 (D.C. Cir. 2022). Specifically, the agent in *Abou-Khatwa* created summary exhibits derived from voluminous documents, including health care invoices and the defendant's business invoices related to health care fraud. *Id.* at 671. The D.C. Circuit found the agent's testimony exceeded the scope of proper summary testimony when she claimed to identify subscribers as fake. *Id.* at 687. In doing so, she "was no longer summarizing the voluminous records reviewed but instead was adding her own inference." *Id.* "In other words, she went beyond summarizing and started opining." *Id.* The D.C. Circuit, noting the claim of error preserved, found the court's error harmless because the agent's identification of fake subscribers was cumulative of other testimony and the testimony did not make "any meaningful difference in the outcome" given the extensive evidence against the appellant. *Id.* Separately, the court concluded that the "instruction to the jury to treat the summary witnesses' testimony as evidence was error" and the court

13

should have provided a limiting instruction that the testimony was "only an aid in evaluating evidence." *Id.* at 688. But the defendant failed to object at trial, and the court held there was no plain error as the lack of instruction did not seriously affect the fairness, integrity, or public reputation of the trial. *Id.*

We recognize that Agent Simms did make some inferences in his testimony, such as eliminating all calls of less than four seconds because they could have been missed calls or voicemails. It is more difficult to see how Agent Simms's testimony went "too far" when he stated whom the phone numbers belonged to or informed the jury the number of times the phones linked to Appellants communicated with other alleged members of the conspiracy. Agent Simms's testimony is not prejudicial error because it was largely cumulative of his previous testimony. Further, the elimination of calls of less than four seconds, while filtering evidence for the jury, did not prejudice Ortiz and Perez as the government adequately showed independent evidence of their guilt. Ortiz and Perez cannot show the lack of limiting instruction related to Agent Simms's testimony was plain error.[4]

---

[4] Appellants make a third argument in their reply that Agent Simms was able to observe other witnesses before being recalled to the stand essentially "to rebut defense counsel's cross-examination" of those witnesses. Reply Br. 13. We do not ordinarily consider arguments that appear for the first time in a reply brief. *See Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995) ("[A]ppellate courts generally will not address new arguments raised in a reply brief because it would be unfair to the appellee and would risk an improvident or ill-advised opinion on the legal issues raised.").

C.

Ortiz next argues his firearm convictions, Counts 9 and 10, are not supported by a valid predicate "crime of violence," and must therefore be vacated. Because Ortiz preserved this claim, we review the issue *de novo*. *United States v. Carthorne*, 726 F.3d 503, 509 (4th Cir. 2013).[5]

VICAR murder requires: (1) there be an "enterprise," as defined in 18 U.S.C. § 1959(b)(2); (2) the enterprise be engaged in "racketeering activity," as defined in § 1961; (3) the defendant committed a murder; (4) the murder violated state or federal law; and (5) the murder was committed for a pecuniary purpose or "for the purpose of gaining entrance to or maintaining or increasing position in [the] enterprise," § 1959(a)).

The underlying murder in violation of state or federal law is a key conduct element in determining if the VICAR offense constitutes a "crime of violence" under § 924(c). Count 8 charged Ortiz with VICAR murder of Mendez. It alleged Ortiz "did murder Victim-23, in violation and punishable pursuant to Maryland Code, Criminal Law §§ 2-201 and 2-204, and the Common Law of Maryland, all in violation of 18 U.S.C. §

---

[5] The government argues that Ortiz waived his claims because he did not address that neither generic federal murder nor Maryland murder qualified as a "crime of violence." Resp. Br. 36. But Ortiz did move to dismiss the firearm offenses on the basis they did not qualify as "crimes of violence," which was rejected by the court. Ortiz properly preserved his claim. *United States v. Robinson*, 744 F.3d 293, 300 n.6 (4th Cir. 2014) (holding that although a petitioner did not make the same "precise" argument before the district court, as he did on appeal, he did "challenge his criminal history score, and thus preserved his claim").

Separately, Ortiz makes a new argument in a reply brief that Count 8 should be dismissed because the court failed to include a special verdict finding. This is an improper new argument in a reply that we do not consider.

15

1959(a)(1)." J.A. 137–38. Count 9 alleged Ortiz "did possess, brandish and discharge a firearm in furtherance of[] a crime of violence," in violation of 18 U.S.C. § 924(c). J.A. 139. Count 10 charged Ortiz with committing a § 924(c) violation resulting in death, in violation of 18 U.S.C. § 924(j). J.A. 140. The predicate "crime of violence" for the firearm charges in Counts 9 and 10 was the VICAR murder of Count 8.

For Ortiz's firearm convictions to stand, his VICAR count must constitute a "crime of violence" under 18 U.S.C. § 924(c)(3). A "crime of violence" is defined as any felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). This provision is known as the force clause. If any—even the least culpable—of the acts criminalized do not entail that kind of force, the statute of conviction does not categorically match the federal standard, and so cannot serve as a predicate. *Borden v. United States*, 141 S. Ct. 1817, 1822 (2021) (holding an offense committed "recklessly" fails to qualify as a violent felony).

To determine whether a felony meets this definition and thus constitutes a "crime of violence," we generally use the categorical approach. *See United States v. Roof*, 10 F.4th 314, 398 (4th Cir. 2021). That is, we "look to whether the statutory elements of the offense necessarily require the use, attempted use, or threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019). We consider only the elements of the crime as defined in the statute, not the facts particular to the case at hand. Thus, we ask whether the "most innocent conduct" criminalized by the statute meets the definition of a "crime of violence." *Roof*, 10 F.4th at 398. In *United States v. Jackson*, the Fourth

Circuit found that "[f]elony murder cannot qualify as a 'crime of violence' because it requires only the mens rea necessary to attempt or complete the underlying felony (i.e., arson, escape, etc.)." 32 F.4th 278, 285 (4th Cir. 2022). "That mens rea is not more than recklessness and thus, does not satisfy *Borden*." *Id.*

Ortiz argues that the underlying offense for each VICAR count was either Maryland first-degree murder or Maryland second-degree murder. He argues because Maryland law establishes both first- and second-degree murder are indivisible offenses that encompass felony murder, his VICAR count cannot qualify as a "crime of violence" based on the ruling in *Jackson*, which would make Counts 9 and 10 void. The government agrees that Maryland first-degree murder and second-degree murder can be committed by felony murder, and it does not dispute that first-degree felony murder fails to qualify as a § 924(c) "crime of violence" after *Borden*.

However, the government argues that VICAR murder underlying Ortiz's convictions under § 924(c) and § 924(j) in Counts 9 and 10, respectively, were predicated on federal murder in violation of 18 U.S.C. § 1111. The reference to § 1111 in the indictment does not identify the predicate "crime of violence" under § 924(c). *See, e.g.*, *United States v. Young*, 248 F.3d 260, 274–75 (4th Cir. 2001) ("Section 924(j)(1) . . . incorporates only the definition of murder contained in section 1111."). In order to resolve whether a murder conviction under the Maryland statute would be a "crime of violence," we look to the state statute. *United States v. Manley*, 52 F.4th 143, 148 (4th Cir. 2022).[6]

---

[6] We recognize that after oral argument in this case, this Court decided *United States v. Thomas*, where the Court ruled because a generic federal offense of assault with a

17

Therefore, we examine the Maryland murder statute and determine whether it is indivisible or divisible.

Here, the relevant section of the Maryland murder statute provides:

(a)   A murder is in the first degree if it is:
   (1)   a deliberate, premeditated, and willful killing;
   (2)   committed by lying in wait;
   (3)   committed by poison; or
   (4)   committed in the perpetration of or an attempt to perpetrate:
      (i)     arson in the first degree;
      (ii)    burning a barn, stable, tobacco house, warehouse, or other outbuilding that:
         1.   is not parcel to a dwelling; and
         2.   contains cattle, goods, wares, merchandise, horses, grain, hay, or tobacco;
      (iii)   burglary in the first, second, or third degree;
      (iv)    carjacking or armed carjacking;
      (v)     escape in the first degree from a State correctional facility or a local correctional facility;
      (vi)    kidnapping under § 3–502 or § 3–503(a)(2) of this article;
      (vii)   mayhem;
      (viii)  rape;
      (ix)    robbery under § 3–402 or § 3–403 of this article;
      (x)     sexual offense in the first or second degree;
      (xi)    sodomy as that crime existed before October 1, 2020; or
      (xii)   a violation of § 4–503 of this article concerning destructive devices.

Md. Code. Ann., Crim. Law § 2-201(a).

---

dangerous weapon, standing alone, can satisfy "crime of violence" requirements in § 924(c), we need not look to the state statute. *United States v. Thomas*, No. 21-7257, 2023 WL 8248037, at *6 (4th Cir. Nov. 29, 2023). We recognize a court may alternatively look to the federal generic offense to satisfy the "crime of violence" requirement. However, because this Court finds the Maryland statute divisible and Ortiz's premeditated murder a "crime of violence," we need not do that separate alternative analysis regarding the generic federal offense.

18

When determining whether a statute is indivisible or divisible, courts "start with the text." *United States v. Allred*, 942 F.3d 641, 649 (4th Cir. 2019). Use of disjunctive language suggests the possibility that the statute is divisible, but it is not dispositive on that point. *Id.*; *see also United States v. Fuertes*, 805 F.3d 485, 498 (4th Cir. 2015) ("[M]ere use of the disjunctive 'or' in the definition of a crime does not automatically render it divisible."). The disjunctive language "or" preceding the felony murder definition in § 2-201(a)(4) suggests the statute might be divisible, but it is not dispositive.

We must next determine whether the text "enumerates various factual means of committing a single element" of one offense or "lists multiple elements [and thus multiple offenses] disjunctively." *Mathis v. United States*, 579 U.S. 500, 506 (2016). One clue can be that when "the behavior underlying one statutory phrase differs so significantly from the behavior underlying another," the statute is generally treated as articulating different crimes. *Allred*, 942 F.3d at 650 (citation and internal quotation marks omitted). Here, the behavior underlying each statutory phrase differs significantly from the behavior underlying another. For example, deliberate, premeditated murder is completely different than first-degree murder committed by arson, carjacking, escape from a correctional facility, or rape. Keeping in mind the behavior underlying the statutory phrases weighs in favor of divisibility, because this clue is not dispositive, we look elsewhere for more clarity.

The focal point of the analysis is what the jury must find (or a defendant must admit) to convict. *Mathis*, 579 U.S. at 506. For that reason, courts frequently consult "how courts generally instruct juries with respect to [an] offense" because the jury must find elements of the offense "unanimously and beyond a reasonable doubt." *Allred*, 942 F.3d at 650. In

19

addition, courts may look at "how the offense has historically been charged." *Id.* at 651. Because "[a] prosecutor charging a violation of a divisible statute must generally select the relevant element from its list of alternatives," that typically "suggests those alternatives are elements rather than means." *Id.* Maryland's model jury instructions for premeditated murder and felony murder are distinct. Md. Crim. Pattern Jury Instructions 4:17, 4:17.7. The notes that accompany the jury instructions provide suggestions for how to use them at trial. The notes accompanying the felony murder instructions advise using them when the defendant is charged with first-degree murder but not when the defendant is charged with premeditated murder. Md. Crim. Pattern Jury Instructions 4:17.7, Notes on Use. Because juries are instructed separately regarding premeditated murder and felony murder, we are persuaded as to the Maryland murder statute's divisibility.

Further, we can also look to a decision of the highest court in the state to answer the question of whether statutory alternatives are treated as elements or means. *Mathis*, 579 U.S. at 517. The Maryland Supreme Court[7], has provided conflicting statements as to whether Maryland treats the alternatives as separate offenses or merely different means of committing the same offense. *Compare Hagans v. State*, 559 A.2d 792, 798 (Md. 1989) ("[P]remeditated murder and felony murder must be treated as separate offenses, with distinct elements, for some purposes."), *and Huffington v. State*, 486 A.2d 200, 202 (Md. 1983) ("[T]he premise for Huffington's argument, that in Maryland felony murder and premeditated murder are identical offenses with identical elements, is incorrect."), *with*

---

[7] The Maryland Supreme Court was formerly called the Court of Appeals.

20

*Ross v. State*, 519 A.2d 735, 737 (Md. 1987) ("[A] conviction of first degree murder may be proved *either* by showing deliberation, wilfulness and premeditation (premeditated murder), or by showing a homicide committed in the perpetration, or attempted perpetration, of one of the enumerated felonies (felony murder). There is but one offense—murder in the first degree—but that offense may be committed in more than one way."). While Maryland caselaw may be unclear and the rest of the clues point to divisibility, we have another clue at our disposal.

If, after consulting the statutory text and other state-law sources, it remains unclear whether the alternatives are means or elements, we may "peek" at the record—for instance, the charging documents and jury instructions used in the defendant's case—to determine whether the statute is divisible. *Mathis*, 579 U.S. at 518–19; *see also Shepard v. United States*, 544 U.S. 13, 20–21 (2005). We consult these sources only "if state law fails to provide clear answers" and "for the sole and limited purpose" of determining whether the statutory alternatives are elements or means, not to examine how the defendant's particular crime was committed. *Mathis*, 579 U.S. at 518 (internal quotation marks omitted). Here, the indictment and jury instructions point to divisibility. Count 1 specified that Ortiz "feloniously, willfully, and with deliberately premeditated malice, killed and murdered [Mendez]," in violation of the Maryland first-degree murder statute. J.A. 125. Further, the district court instructed the jury that Maryland first-degree murder required proof that the defendant acted willfully, deliberately, and with premeditation, and that Maryland second-degree murder required an intent to kill or the intent to inflict such serious bodily harm that death would be the likely result, but not premeditation or deliberation. J.A. 672–73.

21

Additionally, the jury returned a special verdict finding Ortiz guilty of the premeditated murder of Mendez. J.A. 789. The peek into these *Shepard* documents point to divisibility.

We are persuaded the statute is divisible. Because of the statute's divisibility, it is not possible to determine by reference to the statute alone if the defendant was convicted of a crime of violence. *Simmons*, 11 F.4th at 254. Accordingly, the modified categorical approach allows us to consult these same record documents such as the indictment, jury instructions, and verdict to determine which version of first-degree murder Ortiz committed. *Jackson*, 32 F.4th at 287. It is clear from the indictment, jury instructions, and special verdict finding described above that Ortiz committed a deliberate, premeditated, and willful killing. Further, "[u]ndoubtedly, federal premeditated first-degree murder is a 'crime of violence.'" *Id.* Premeditated murder necessarily requires the use of "*violent force* — that is, force capable of causing physical pain or injury to another person." *Id.* (citing *Johnson v. United States*, 559 U.S. 133, 140 (2010)). Ortiz's VICAR premeditated murder qualifies as a "crime of violence."[8]

### D.

Next, we consider Ortiz's argument that his RICO and VICAR convictions violate the Double Jeopardy Clause. This Court reviews a Double Jeopardy claim *de novo*. *United States v. Schnittker*, 807 F.3d 77, 81 (4th Cir. 2017).

---

[8] Because the jury found that Ortiz committed first-degree murder, this Court need not decide whether Maryland second-degree murder is a "crime of violence."

22

The Double Jeopardy Clause bars the government from prosecuting a defendant twice for the same offense. *E.g.*, *Currier v. Virginia*, 138 S. Ct. 2144, 2149 (2018). The Fourth Circuit has held that, at a single trial, separate convictions and punishments for RICO and VICAR, or for conspiracies to commit those two offenses, do not violate double jeopardy principles because they have different elements and because Congress intended cumulative punishment for those offenses. *United States v. Devine*, 40 F.4th 139, 150–51 (4th Cir. 2022) (VICAR and RICO); *United States v. Ayala*, 601 F.3d 256, 265–66 (4th Cir. 2010) (VICAR conspiracy and RICO conspiracy). Ortiz's RICO and VICAR convictions do not violate the Double Jeopardy Clause.

E.

Next, Perez and Ortiz argue that their sentences were not substantially unreasonable. We consider Ortiz's and Perez's sentences in turn.

At sentencing, Ortiz requested "some time" of imprisonment rather than a life sentence because he had no prior criminal history, was employed, supported his family, and was not involved in the charged robbery. He further argued he was victimized by MS-13. The district court stated it had reviewed the sentencing memorandum and Jackson's (Mendez's partner's) impact statement.

Applying the 18 U.S.C. § 3553(a) factors, the trial judge agreed that Ortiz had no criminal history and made a "terrible mistake" by getting involved with MS-13. Further, the trial court considered the sentence disparity factor in § 3553(a)(6), explaining it had reviewed MS-13 cases submitted by the government and the MS-13 sentences imposed by

23

other judges in the district. The court, nonetheless, imposed life terms on Counts 1 and 8, and a ten-year term on Count 7 to run concurrently. The court also imposed a ten-year term on Count 9, and a life term on Count 10 that run concurrent of each other but consecutive of the other terms. The trial court believed it was required to impose a consecutive sentence on Count 10.

The trial court considered the mitigating evidence, presentence report, the parties' arguments, the sentences of other MS-13 defendants, and other sentencing factors. The trial court stated the life sentences were justified in light of the "wanton nature of the murder" Ortiz committed in the name of MS-13. *See United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011) (observing that sentencing courts "have extremely broad discretion when determining the weight to be given each of the § 3553(a) factors"); *Gall v. United States*, 552 U.S. 38, 51 (2007) (stating we must "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance").

However, in *United States v. Palacios*, 982 F.3d 920, 924-925 (4th Cir. 2020), we held that a sentencing court may not impose cumulative punishments for § 924(c) and § 924(j) if those violations are based on the same conduct. Here, Ortiz's § 924 (c) and § 924(j) punishment was based on the same victim. Therefore, as the government agrees, the proper remedy pursuant to *Palacios* is to dismiss Count 9.

In addition, the Supreme Court recently held that a sentence under § 924(j) can be imposed concurrently or consecutively. *Lora v. United States*, 599 U.S. 453 (2023). Therefore, the district court was mistaken in believing it was required to impose a life sentence on Count 10 consecutive of Counts 1, 7, and 8. The government does not contest

24

this point. We therefore vacate Ortiz's consecutive sentence on Count 10 and remand to the district court for resentencing.

Perez's guideline range was life based on Total Offense Level 43 and Criminal History Category IV. Perez's counsel argued Perez did not have a stable home or bright future after noting life imprisonment on Count 6 was mandatory under the Sentencing Guidelines. The judge considered Perez's mitigating factors, including sentencing disparities, and noted Perez was not unlike other MS-13 members recruited at a young age. Because the sentencing guidelines mandated a life imprisonment on Count 6 and because the court considered the 3553(a) factors, the trial court did not abuse its discretion in sentencing Perez.

## III.

For the foregoing reasons, we AFFIRM IN PART, VACATE IN PART, and REMAND for further proceedings consistent with this opinion. We vacate Counts 9 and 10 with instructions for the district court to dismiss Count 9 and resentence Ortiz on Count 10. We affirm Perez's sentence in its entirety.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*